# Barr *et al. versus* Moore.

1. A libel may be defined to be any malicious publication, written, printed or painted, which by words or signs tends to expose a person to contempt, ridicule, hatred or degradation of character.

2. Art. 1, sect. 7, of the constitution, which declares, "no conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, when the fact that such publication was not maliciously or negligently made, shall be established to the satisfaction of the jury," refers only to a trial on an indictment for libel and does not apply to a civil action to recover damages.

3. Where a newspaper article charges a person with corrupt and mercenary acts as the chairman of the county committee of a political party; that he is the champion of prostitutes and the lowest grades of criminals; with a wicked and corrupt disregard of his official oath as an attorney-at-law, and also strikes at his integrity as a man and tends to degrade his social standing as a citizen, such an article is *per se* libellous and is not privileged in its character, and the publishers, failing to establish its truthfulness, are liable for damages.

4. Malice in its legal sense means a wrongful act done intentionally, without just cause or excuse, and, every utterance or publication, having the other qualities of slander or libel, if it be wilful and unauthorized, is in law malicious.

5. Legal malice alone is sufficient to support an action.

6. The fact that the alleged libel renders the defendant liable to an indictment does not prevent the jury from giving vindictive damages in a civil action for libel.

6 NORRIS—25

[Barr *v.* Moore.]

7. It was error, for the purpose of .showing malice, to permit evidence to be given, that other articles of similar tenor and character as the alleged libellous one were subsequently published in the defendant's newspaper, where neither the paper itself containing said articles was produced or any reason given for its non-production.

October 12th and 14th 1878.   Before AGNEW, C. J., SHARS-WOOD, MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY, JJ.

Error to the Court of Common Pleas, No. 1, of *Allegheny county:* Of October and November Term 1877, No. 177.

Case for libel brought by William D. Moore against James P. Barr and others. The declaration set out that defendants were the editors and proprietors of "The Post," a daily morning newspaper, published in the city of Pittsburgh, which paper, on Monday the 16th of February 1874, contained as an editorial a libellous article concerning the plaintiff. This editorial, in substance, will be found in the opinion of this court.

Defendants filed a special plea, "That they, the defendants, at the time of the publication of said alleged libellous article, as in said declaration stated, were the publishers, in the city of Pittsburgh, of a certain public newspaper, called the "Pittsburgh Post;" and at said time the said W. D. Moore was chairman of the county committee of the Democratic party, in said county of Allegheny, and in such public capacity his actions, sayings and doings were a proper subject for investigation and information, and that said alleged libel related to the official conduct of said W. D. Moore acting in a public capacity, and was proper for public information, and was written in reply to certain matter published by said Moore, chairman of the Democratic county committee, in certain newspapers of said city of Pittsburgh, shortly before the publication of said alleged libellous matter by said defendants. Nor was said publication maliciously nor negligently made."

The case was first tried before Sterrett, P. J., in June 1875, when the verdict was for the plaintiff for $10,000. On motion a new trial was granted, on the ground that this verdict was excessive, and a new trial was had before Sterrett, P. J., in June 1877. At this trial it appeared that the spring political campaign in Allegheny county in 1864 was a particularly bitter one. Moore was the chairman of the Democratic county committee at this time, and John H. Elder was the Democratic candidate for city controller of Pittsburgh, and Peter Farley, the candidate of the same party for mayor of Allegheny City. On the Saturday preceding the election Moore, signing himself the chairman of the Democratic county committee, published a card in certain papers of the city of Pittsburgh, charging, first, that Elder was ineligible to the office of controller, and second, that he was unworthy of the support of Democrats, because he had supported at a recent election the Republican candidate for state treasurer. The card further asserted that there was no Democratic candidate for mayor in the city of Allegheny. Mr. Farley,

[Barr v. Moore.]

it appeared, was running as the citizens' candidate, with the understanding that the Democrats, who made no nomination, were to support him. On the morning after the publication of Moore's card a number of Democrats collected at the office of the "Post," at which meeting Barr was present, and severe complaint was made of this article. The next morning the alleged libellous article appeared in the "Post." It appeared also from the testimony of Moore and others that Moore entertained feelings of hostility to Elder, and that the latter belonged to the "Barr faction" of the Democratic party, against whom a bitter feeling existed on the part of the faction to which Moore belonged.

The defendants contended that the purpose of the article was to counteract the effect of Moore's card, which promised to bring disaster upon the Democratic party, appearing on the eve of an election, coming from one in authority in the party, and thus severely reflecting on two of its prominent candidates; and that it was the duty of the "Post," as the organ of the party, to do all it could to remedy the mischief, and that with this view the article in question was written and published, and not with any desire to do Mr. Moore any peronal injury.

Mr. Moore being on the stand, plaintiff's counsel asked him if he had seen articles of the same tenor and character in the "Post" subsequent to the one declared on as libellous in the next ten days or two weeks. Objected to as irrelevant, and on the ground that the newspaper itself was the best evidence of such publication. The objection was overruled and Moore stated that he had seen such articles. Mr. Barr, when subsequently called for the defence, contradicted this assertion, and said there were no other publications of like tenor and effect, or in any way confirmatory of the one published, other than one or two communications and answers thereto, denying the right of Moore, as chairman of the county committee, to interfere with the city elections.

The second point of the plaintiff was as follows: " That the publication charged in the declaration is libellous *per se.*" Affirmed.

The following were among the points presented by defendants, with the answers of the court thereto:

3. That if the jury believe from the evidence the plaintiff was chairman of the Democratic county committee, and as such caused to be published in the " Leader" the card given in evidence, his acts, conduct and publication of said card in that capacity were proper subjects for public information, and open to criticism by defendants as editors and publishers of " The Post;" and if the jury further finds from the evidence that the defendants, without malice, in fact from good motives, and with probable cause to believe the charges contained in the alleged libellous article were true, published the same, such publication is in law privileged, and plaintiff cannot recover. Refused.

6. That if the jury believe from all the evidence in the case, that the defendants published the articles contained in " The Post," given in evidence without malice in fact, or personal hatred towards the plaintiff, and had probable cause to believe he had, under certain circumstances of suspicion, induced by his acts, conduct and authorship of the card published in the "Leader," violated his duty as chairman of the Democratic county committee, and by reason of his conduct as aforesaid, had placed himself in a position to warrant the belief in the mind of a cautious person that he was guilty of the acts charged against him in said article published by them, there should be no recovery by the plaintiff. Refused.

9. If the court should be of opinion, from all the evidence in this case, that an indictment would lie against the defendant for the publication of the alleged libellous article, then by reason thereof vindictive damages cannot be awarded by the jury. Refused.

11. That as matter of law, under all the evidence in this case, vindictive or exemplary damages cannot be given by the jury, the evidence not showing a case warranting the jury to find the same. Refused.

The court charged the jury, inter alia, as follows :

"Whilst it may be justly claimed that the publication of the plaintiff's article was, under the circumstances, well calculated to provoke a swift and sharp reply in terms calculated to counteract its real or supposed evil effect, the publication complained of goes beyond this, and assails the personal character of the plaintiff in a way that was uncalled for. * * * Accordingly, we are asked in this case to say that the article complained of is libellous, and we instruct you as a matter of law that it is. It cannot be regarded as a privileged communication, its publication cannot be justified or excused, and inasmuch as its tendency was to injure the reputation of the plaintiff, we are of opinion it is libellous and actionable, and that your verdict should be in favor of the plaintiff. The amount which he is entitled to recover is a matter solely for your determination under the evidence before you. * * * While compensation simply is ordinarily, the measure of damages in libel, there are cases in which vindictive or exemplary damages are justifiable and proper. Where the evidence shows that the wrongful act complained of was accompanied by circumstances of aggravation, where there has been express, wanton, or unmitigated malice on the part of the wrong-doer, the jury may, in assessing damages, go beyond simply compensation to the injured party, and in addition thereto, give such exemplary damages as the circumstances of the case may appear to warrant. Whether the present is a case in which you should give exemplary or vindictive damages or not, we are not called on to express or intimate any opinion."

The verdict was for the plaintiff for $3000, and after judgment thereon the defendants took this writ and assigned for error, inter

[Barr v. Moore.]

alia, the admission of the evidence, the answers to points, and the portion of the charge noted above.

*Hampton & Dalzell, Wier & Gibson, S. Schoyer, Jr., L. C. Schoyer* and *A. K. McClure*, for plaintiffs in error, contended that sect. 7, art. 1, one of the Bill of Rights, brought into the law of libel in this state an entirely new principle, which principle was that when matter complained of as a libel is matter proper for public information, and it is established that it is published without negligence and without malice, that a criminal prosecution cannot be maintained for such publication, and that further, this same clause of the constitution provided, in order to properly carry it into effect, that where a party sought to be charged with damages in an action for libel, can successfully bring himself within the requirements of the section and can prove what would acquit him on an indictment in a criminal suit, he can likewise by availing himself of its provisions entitle himself to a verdict in a civil suit.

Political parties were recognised even by the courts in this state, and therefore, Mr. Moore, the leader of a great political party in the city of Pittsburgh, was acting in a public capacity and as such his acts and declarations were proper subjects of comment and review. All persons, such as public lecturers, preachers, officers of great corporations, lawyers, managers of public places of amusement, who draw public attention to them through their acts and the public duties they discharge, are " men in public capacity," within the meaning of the Bill of Rights. And newspaper comment on them, if not actuated by malice or marked by negligence, even though the article were untrue, can be published without subjecting the publisher to damages in a suit for libel. The 7th section has recently had a judicial construction in the Quarter Sessions of Philadelphia, and interpreted to be an extension of the privileges of the press beyond public offices, properly so called, to all those who assume to act in a public capacity, draw public attention, and put themselves in a relation to the community that a private citizen does not. It was there ruled that those occupying such positions are subject to fair report and criticism, and those who speak of them, are held only to an abuse of the privilege they are entitled to enjoy under the clause of the constitution : Commonwealth v. McClure, 3 W. N. C. 58; Commonwealth v. Taggart, and Commonwealth v. The World, both unreported.

It is further contended, that the communication is a privileged one, and that the court should have charged the jury that where a person in a public capacity, so misbehaves himself as to create in the minds of ordinarily prudent people, a reasonable belief that he is acting contrary to his duty and is guilty of impropriety and dishonesty, he cannot recover damages from those who, without malice and from good motives, published what they have reason to believe

[Barr *v.* Moore.]

of him upon probable cause, even though the charges may not be true: Chapman *v.* Calder, 2 Harris 365.     The court should have charged that if defendants published their reply to Moore's card, not maliciously or negligently, there could be no recovery: Kinyon *v.* Palmer, 18 Iowa 377 ; Edwards *v.* Chandler, 14 Mich. 475; Detroit Daily Post *v.* McArthur, 16 Id. 47 ; Kelly *v.* Sherlock, Law Rep. 1 Q. B. 686 ; Kelly *v.* Tinling, Id. 699.

The case was not such an one as would entitle the plaintiff to vindictive damages, and the court should have so instructed the jury : Rose *v.* Story, 1 Barr 197 ; Amer *v.* Longstreth, 10 Id. 148; Forsyth *v.* Palmer, 2 Harris 96 ; Seely *v.* Alden, 11 P. F. Smith 392 ; Stanfield *v.* Phillips, 28 Id. 75.

It was error to permit the plaintiff to testify as to the articles in the newspaper.     The paper itself was the best evidence and should have been produced.

*T. M. Marshall* and *M. Swartzwelder,* for defendant in error, argued that the libel complained of, was of a gross and offensive nature ; that under the section of the Bill of Rights relied on by the plaintiffs in error, no new privilege and no new liberty was given to the press, and that under it, that which would acquit in a criminal case, could not be allowed to work a verdict for the defendant in a civil action for damages; but·that, even could it do this, and were the leader of a political party, a person that it was the privilege of a newspaper to attack, the attack could only be upon the individual in his public capacity, and a bitter personal libel, like the one complained of, would none the less subject the publisher to a suit for damages, and the court was therefore right in ruling that this publication was a libel *per se.*

Mr. Justice MERCUR delivered the opinion of the court, November 18th 1878.

This was an action to recover damages for the publication, by the plaintiffs in error, of an alleged libellous article.     It appeared in a daily newspaper, of which they were the editors and proprietors. The plea admits the publication, and without averring any fact therein charged to be true, substantially claims that inasmuch as the defendant in error was chairman of the county committee of the Democratic party, his acts in such capacity were a proper subject for investigation and information, and as their article was in answer to a certain publication made by him, the alleged libellous article was proper for publication, and therefore they had a right to publish it.

The first assignment of error is to the court having instructed the jury that the publication of the article charged in the declaration was libellous *per se.*     Did the court err in so instructing ?

A libel may be defined to be any malicious publication, written,

[Barr *v.* Moore.]

printed or painted, which by words or signs tends to expose a person to contempt, ridicule, hatred or degradation of character : Runkle *v.* Myer *et al.*, 3 Yeates 518 ; McCorkle *v.* Binns, 5 Binn. 340 ; Pittock *v.* O'Niell, 13 P. F. Smith 258.   In 1 Am. Lead. Cas., § 116, after citing many English and American cases, the learned authors say, " upon a consideration of the various cases on the subject, we may conclude that any publication injurious to the social character of another, and not shown to be true, or to have been justifiably made, is actionable as a false and malicious libel."

Passing then to the publication complained of, we find it reads : " An Impostor.—A man who resides in Allegheny City named W. D. Moore, and who subscribes himself as chairman of the Democratic county committee, appeared in yesterday's Sunday papers in a card addressed to the Democratic voters of this city of Pittsburgh, for the writing of which he was paid a fee by the ring, and the publication of which was paid for out of the corruption fund of the Mc-Carthy–Magee–Snodgrass ring, in which the impudent impostor attempts to dictate to the Democratic voters of this city.   This man Moore is in the pay of the ring, and the fact does not surprise us in the least when we reflect that he has descended from the high calling of a clergyman to the recognised champion and professional defender of prostitutes and the lowest grade of criminals who throng the audience halls of our police and criminal courts ; and he seems to follow his profession solely for the purpose of making money, and his opinions are moulded by the extent of his client's means to pay, The money of the ring ; the money of the prostitute, and the money of the libertine and burglar, is all alike to him if he is duly intent on making money.   Does this man Moore fancy that because he has bartered himself away that he has sold and transferred a single Democrat in fee simple to the ring robbers ?"

It needs no labored argument to prove that this language tended to expose the defendant in error to contempt, hatred and degradation of character.   He is thereby charged with corrupt and mercenary acts, as chairman of the county committee ; with being the recognised champion of prostitutes and the lowest grades of criminals, and substantially that his professional opinions, as an attorney of the courts, are not given with integrity and good faith, but are moulded and prostituted according to the amount of money he receives therefor.   It impliedly charges a wicked and corrupt disregard of his official oath to behave " with all good fidelity as well to the court as to the client." It also strikes at his integrity as a man and tends to degrade his social standing as a citizen.   It would be difficult to charge a more disreputable course of conduct or to present a darker picture of professional character.   The learned judge was clearly right in holding the publication of the article charged in the declaration to be libellous *per se.*

The defendant in error was not a candidate for any office.   Conced-

[Barr *v.* Moore.]

ing his action as chairman of the Democratic county committee to have been a proper subject for an organ of his party to investigate and to criticise with considerable freedom, yet that fact affords no legal justification for the fierce onslaught made upon him. It goes far beyond answering, refuting and denying everything averred or intimated in the publication made by him. His publication proclaimed to the Democrats of the city of Pittsburgh, that their candidate for controller was ineligible to that office under the city ordinance; and that at a late preceding election for the office of state treasurer, he had actively and openly supported the opposition candidate, and opposed the nominee of his own party; and he notified the Democrats of Allegheny city, that they had no'Democratic candidate for mayor, nor was any man running, who was entitled by the usages of the party, to call himself their representative. Although this publication may have been in bad taste or even unjustifiable towards his party, and towards the one candidate nominated, and the other adopted and supported by it, yet it did not necessarily reflect on the moral character or integrity of either of them. If the answer of the plaintiffs in error had kept within the bounds of truth; if, by their plea they had averred the truthfulness of the facts which they alleged, and sustained that plea by evidence, a different case would be presented. They put in no such plea. They gave no evidence to sustain their allegations, nor could they, under the pleadings. Practically they admitted the charges made in their publication to be untrue. Although they were false in fact, yet it was urged that the article was so far a privileged communication, as to protect the publishers thereof against this action. To support this position, they invoke the aid of that part of art. 1, sect. 7, of the constitution of 1874, which declares "no conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made, shall be established to the satisfaction of the jury." In answer we say this clause refers only to attempted "conviction" in a "prosecution," and in no wise applies to a civil action to recover damages. It would be a clear perversion of language to extend it to any case other than a "prosecution" in which a "conviction" is sought. It manifestly refers to the trial on an indictment for a libel.

The liberty of the press should at all times be justly guarded and protected; but so should the reputation of an individual against calumny. The right of each is too valuable to be encroached on by the other. Hence, another part of the section just cited declares "the free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that

[Barr v. Moore.]

liberty." Thus it appears this right or liberty is not one of unlimited license; but it is restrained by a legal responsibility.

The high esteem in which reputation is held, and the protecting care which the organic law has thrown around it, are clearly expressed in the first section of the Declaration of Rights. It declares "all men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Thus reputation and property are put on the same high ground. The fundamental law affirms the same inherent and indefeasible right in all men to protect the one as fully as the other. This language in the Declaration of Rights naturally flows from the doctrine of the common law. The natural right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health and his reputation. The security of his reputation or good name from the arts of detraction and slander are rights to which every man is entitled by reason and natural justice. The reason given is that without this "it is impossible to have the perfect enjoyment of any other advantage or right:" 1 Blackstone's Com. 134. The right to protect reputation being inherent in man and being indefeasible, it cannot be annulled by legislative action. A good reputation is too valuable to admit of its being falsely assailed without the law giving some redress to the person injured. The general liberty of the press must be construed in subordination to the right of any person calumniated thereby, to hold it responsible for an abuse of that liberty. It follows that the article published by the plaintiffs in error was not privileged, and having failed to establish its truthfulness, they are liable in damages.

Although malice is a necessary ingredient in slander and libel, yet it must be understood in its legal signification. In its common acceptation malice means ill-will against a person; but in its legal sense it means a wrongful act done intentionally, without just cause or excuse, and therefore every utterance or publication having the other qualities of slander or libel, if it be wilful and unauthorized, is in law malicious. Legal malice alone is sufficient to support an action. If the words are actionable in themselves, as we have shown them to be in this case, and not being privileged, the publication of them is sufficient evidence of legal malice; 1 Am. Lead. Cas. 192. The falsity of the publication creates an implication of malice: Farley v. Ranck, 3 W. & S. 554.

We see nothing in the several assignments relating to damages, that calls for correction. The fact that an indictment may be sustained, does not preclude the jury from giving vindictive damages. When the act is both a public and private wrong, the public and the person aggrieved, each has a distinct and concurrent remedy: Foster v. Commonwealth, 8 W. & S. 77. If the party aggrieved

[Barr *v.* Moore.]

makes out a case which justly calls for vindictive damages, his right thereto cannot be defeated by the fact that the plaintiffs in error may be punished for an injury to the public.

With one exception we find no error in the record. That error is found in the bill of exceptions, and is covered by the second assignment to the evidence. The learned judge erred in permitting the witness to testify that articles of the same tenor and character, were afterwards published in the paper of the plaintiffs in error, without producing those articles, or giving any valid reason for their non-production. The best evidence of their contents was not given. No ground was laid for the admission of secondary evidence. Nor was the error cured by the fact that one of the plaintiffs in error afterwards testified that no such articles were published. The evidence was given for the purpose of swelling the damages. If true, such was its natural effect. How far it influenced the amount of the verdict we have no means of ascertaining. It is sufficient for us to say that it may have increased the amount. For this error and for this alone, evidently made in the hurry of the trial, the judgment must be reversed.

Judgment reversed, and *venire facias de novo* awarded.